UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**RICHARD H. ELBERT, JR.,**

      **Petitioner,**

**v.**                             **Case No. 8:21-cv-2935-MSS-LSG**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

      **Respondent.**

_____/

## O R D E R

Elbert petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court conviction for burglary. (Doc. 1) After reviewing the petition, the response (Doc. 8), the reply (Doc. 21), and the relevant state court record (Docs. 8-2 and 8-3), the Court **DISMISSES** in part and **DENIES** in part the petition.

## PROCEDURAL HISTORY

A jury found Elbert guilty of burglary of a dwelling. (Doc. 8-2 at 857) The trial judge sentenced Elbert as a violent career criminal offender to forty years in prison (Doc. 8-2 at 861), and the state appellate court affirmed. (Doc. 8-2 at 1190) The post-conviction court granted in part and denied in part Elbert's motion to correct his sentence (Doc. 8-3 at 2–4) and amended the judgment and sentence by striking a fine (Doc. 8-3 at 16–19), and the state appellate court affirmed. (Doc. 8-3 at 62) Elbert filed a petition alleging ineffective assistance of appellate counsel (Doc. 8-3 at 279–321), and the state appellate court denied the petition. (Doc. 8-3 at 390) The post-conviction court denied Elbert's motion for post-conviction relief

(Doc. 8-3 at 458–65, 615–23), and the state appellate court affirmed. (Doc. 8-3 at 745) Elbert's federal petition followed.

## FACTS

On March 29, 2010, in the morning, Brenda Hitt set her home's alarm system before leaving for an appointment. (Doc. 8-2 at 529–30) At 9:41 A.M., a person who worked at the company that monitored the alarm system called Hitt because a motion detector at the home activated (Doc. 8-2 at 509–13), and Hitt returned home with a police officer. (Doc. 8-2 at 534) Hitt and the officer observed a broken window and an opened door. (Doc. 8-2 at 535–38, 581–83) A crime scene technician found one fingerprint on the frame of the broken window and drops of blood in a bathroom and a hallway. (Doc. 8-2 at 600–09) A latent print examiner determined that the fingerprint did not contain sufficient detail for a comparison. (Doc. 8-2 at 624–25) DNA from swabs of the blood matched Elbert's DNA. (Doc. 8-2 at 651–59) The frequency of occurrence of the DNA profile in the Caucasian population was one in 140 trillion. (Doc. 8-2 at 659)

During the defense's case, Elbert presented an alibi defense. Elbert, an eighteen-time convicted felon, testified that, in December of 2009, he was released from prison. (Doc. 8-2 at 734–35) Elbert testified, after his release from prison, two members of the Aryan Brotherhood whom he met in prison, Christopher McMillen and another person, visited him at his home. (Doc. 8-2 at 738) He testified that he reported the visit to a special agent with the Florida Department of Law Enforcement. (Doc. 8-2 at 739) He testified that, on March 21, 2010, after reporting the visit, he allowed McMillen and McMillen's girlfriend to stay at his home. (Doc. 8-2 at 739–40) He testified that, after he told McMillen's girlfriend that he was

looking for his son, McMillen's girlfriend drew blood from him and placed his blood in a vial for DNA testing. (Doc. 8-2 at 740, 743–44)

Elbert testified that, on Friday, March 26, 2010, around 10:30 P.M., he violated his curfew by leaving home to eat at a restaurant. (Doc. 8-2 at 744–45) He testified that, on Monday, March 29, 2010, he went to the probation office to explain to his probation officer why he violated curfew. (Doc. 8-2 at 745–47) He testified that his friend drove him to the probation office, he arrived around 8:00 A.M., he waited for about forty minutes, and he left without meeting with his probation officer because he did not have an appointment. (Doc. 8-2 at 747–52) He testified that he returned home, worked on a car with his ex-father-in-law, spoke with his sister around 10:00 A.M., and left with his friend to eat lunch at a restaurant. (Doc. 8-2 at 753–55) Elbert denied going to the burglarized home. (Doc. 8-2 at 755–56, 758)

Elbert's neighbor testified that, on a day in 2010 around 8:00 A.M., he drove Elbert to the probation office and drove him back home. (Doc. 8-2 at 690) Elbert's probation officer confirmed that, on March 29, 2010, at 8:00 A.M., Elbert signed a visitor's log. (Doc. 8-2 at 730–33) Elbert's sister testified that, on March 29, 2010, around 9:15 A.M. or 9:30 A.M., she met with Elbert for about an hour. (Doc. 8-2 at 702–04) Elbert's neighbor testified that, around 10:00 A.M. that same day, he drove Elbert to a restaurant and back home. (Doc. 8-2 at 691–92) Elbert's ex-father-in-law testified that, in the morning on a day in March or April of 2010, Elbert helped him fix his truck. (Doc. 8-2 at 696–97)

During closing argument, trial counsel argued that Elbert did not burglarize the home and that the person who burglarized the home framed Elbert by leaving two drops of Elbert's blood at the home. (Doc. 8-2 at 805, 810, 812–13, 815–16)

## STANDARDS OF REVIEW

**AEDPA**

Because Elbert filed his federal petition after the enactment of the Antiterrorism and

Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320,

327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim —
>
> (1)    resulted in a decision that was contrary to,
>        or involved an unreasonable application
>        of, clearly established Federal law, as
>        determined by the Supreme Court of the
>        United States; or
>
> (2)    resulted in a decision that was based on an
>        unreasonable determination of the facts in
>        light of the evidence presented in the State
>        court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives

at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law

or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of

materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision

involves an unreasonable application of clearly established federal law "if the state court

identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions

but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529

U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S.

Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Elbert asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), explains that a petitioner must demonstrate both deficient performance and prejudice:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard*

*v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court dismisses the claim as procedurally defaulted. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

To excuse a procedural default on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

## ANALYSIS

### Ground One

Elbert asserts that the trial judge violated his Fifth Amendment right against double jeopardy. (Doc. 1 at 9–10) He alleges that, during his first trial, a witness could not appear to testify on behalf of the defense because the witness was admitted to the intensive care unit at a hospital. (Doc. 1 at 9) He alleges that the trial judge refused to grant a continuance or admit deposition testimony by the unavailable witness. (Doc. 1 at 9–10) He asserts that the trial judge violated his right against double jeopardy by instead declaring a mistrial and granting a new trial. (Doc. 1 at 9–10) At the second trial, the jury found him guilty of burglary. (Doc. 1 at 9)

Elbert raised the double jeopardy claim on direct appeal (Doc. 8-2 at 1119–27), and

the state appellate court affirmed in a decision without a written opinion. (Doc. 8-2 at 1190)

Elbert must demonstrate that there was no reasonable basis for the state appellate court's

denial of relief. *Richter*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied

by an explanation, the habeas petitioner's burden still must be met by showing there was no

reasonable basis for the state court to deny relief.").

At the first trial, trial counsel moved for a mistrial after a detective testified that he

sent a swab of the blood found at the burglarized home to a laboratory for a comparison

with DNA samples in a CODIS database (Doc. 8-2 at 365–70):

| | |
|---|---|
| [Prosecutor:] | And what, if anything, did you do with respect to following up on the blood that had been recovered at the scene? |
| [Detective:] | I requested that the blood be sent to the lab for a CODIS search. "CODIS" stands for Combined DNA Indexing System. |
| [Prosecutor:] | And is that just a database of known individuals? |
| [Detective:] | It is. You know, CODIS is a computer software that houses convicted felons' data — DNA, DNA — |
| [Trial counsel:] | Objection, your Honor. May we approach? |
| [Judge:] | Approach. |
| | (Bench Conference) |
| [Judge:] | Expecting that answer? |
| [Prosecutor:] | No, not at all, Judge, you know, no. |
| [Judge:] | Is your guy definitely planning on testifying? |

| | |
|---|---|
| [Trial counsel:] | I — not yet. We weren't yet because we can get out everything through — |
| [Judge:] | Well, the reality is [ ] I told [them] he was on probation or work release. So, even though that is an unfortunate answer, I don't think it's inconsistent with anything we told them in the opening statement. |
| [Trial counsel:] | Right, but we didn't say "felony probation," and now he said "convicted felons." |
| [Judge:] | Well, but the reality is it's a work release. There's no misdemeanor work release. |
| [Trial counsel:] | They don't know that. |
| [Judge:] | I know, but I don't think we would go out of our way to mislead them about what he's — if he's on Department of Corrections work release. We massaged it in the opening, but at some point, I think if we explain to them what that meant, it meant that after he was released, he would be on some type of continuing supervision.

I mean, conditional release is an early release of prison to be on supervision based on their being in prison, right? |
| [Trial counsel:] | Uh-huh. |
| [Judge:] | That's the reality of what it is. |
| [Trial counsel:] | Uh-huh. |
| [Judge:] | If we were going to explain that to them, then they would know that he was a convicted felon anyway because he wouldn't have been — we don't send people that are not convicted felons to prison. |

|                    | So, I mean, if you want me to ask — if you want to ask for a mistrial, I'll consider it, but I'm trying to think of the prejudice regarding that in deciding — obviously, if he testifies, that's cured. |
|--------------------|--------------------|
| [Trial counsel:]   | Right. |
| [Judge:]           | I'm not asking you to make a commitment of whether he is. I was inquiring whether he was planning to. If the answer is yes, it will be cured as to whether or not he's a convicted felon and how many times, but inferentially based on the facts of the case, they will know he is anyway because of work release. |
|                    | Does your guy want you to ask for a mistrial? |
| [Trial counsel:]   | I have to ask him. I just objected and — |
| [Judge:]           | Go ahead. We'll stand here. Go ask him real quick whether he wants you to or not. |
| [Trial counsel:]   | He wants the mistrial. |
| [Judge:]           | Okay. I don't really want to inquire into your defense, but at one point he had insisted that he was [going] — his defense was [going to] be that the Aryan Brotherhood was reaching out from prison and planting the blood. I don't — I mean, that could still be a defense that you could put on if he took the stand and said — because your opening seemed to imply that somebody had access to his blood. |
| [Trial counsel:]   | Uh-huh. |
| [Judge:]           | If that was [going to] be the defense, then, again, they would already — or ultimately hear that he had been in prison and that for something that happened in prison, |

|                   | these guys were [going to] be after him. I don't know if that's still in play or not. |
|-------------------|--------------------------------------------------------------------------------------|
| [Prosecutor:]     | He also had attained a sign-in log from the DOC office on the day of the burglary that he had signed in at 8:00 A.M., claiming as part of his alibi that he had to go to a government office and that he had an appointment there and that there is no way this could have happened when he was there. So, you know, it's coming out that he was with DOC, Judge. I don't see how this is all that prejudicial in light of their opening statement. They opened the door to getting into that. |
| [Judge:]          | I think at this point I'm [going to] deny the motion for mistrial. I think at the close of all the evidence when you're doing your [motion for judgment of acquittal], that you'll probably renew it. |
| [Trial counsel:]  | Uh-huh. |
| [Judge:]          | And if I don't think the prejudice has been specifically attenuated enough, then I guess I'll probably have to readdress it, but I think there's enough in play that I'm not [going to] grant it now. I think you've protected your record and you'll further protect it at the end, and we'll just see what develops and whether I think that — because, obviously, it could be prejudicial — if there was no mention or [going to] be any mention of anything tied to being in jail, then I would grant it, but I think there's some things in play here that might take away the prejudice. So, I'll deny the it with leave for you to re-raise it at the close of all the evidence. |

Trial counsel renewed the motion for mistrial after learning that a witness, who was admitted to the intensive care unit at a hospital, could not testify for the defense (Doc. 8-2 at 414–28):

[Judge:]                    All right. You confirmed that Mr. McGuffin is in the ICU at the hospital, State?

[Prosecutor:]        That's right, Judge. He's been there since Monday. Obviously, if we — it would have been nice to have known this yesterday before saying that everyone was ready to go.

As to his deposition, we're not [going to] stipulate to his deposition. You know, we would like to have a full and fair opportunity to impeach him, which I have provided materials in advance of the trial to Ms. McCabe [ ] in light of his deposition testimony.

[Judge:]                    So, you're putting me in the box to decide? Given the prior remark about convicted felon, you really think with a record — let's play this out. Okay. I take your objection. I don't let the depo in. So, they don't hear from McGuffin, who's one of their main alibi witnesses. We've already had the reference to a convicted felon in there, which may or may not get cleaned up some, and he's facing — is it [a] [prisoner releasee reoffender] or [violent career criminal enhancement]? Which is he?

[Prosecutor:]        All of the above.

[Judge:]                    VCC also?

[Trial counsel:]     Yep.

[Judge:]                    So, he gets what you want at the end of the trial. He's convicted. He gets forty with a thirty-year [minimum mandatory], and you're [going to] say that an appellate court thinks that he got due process under those circumstances? Is that the position you're urging me on?

[Prosecutor:]        Judge, I'm —

[Judge:]        I might as well just throw myself on a hand grenade and blow myself up.

[Prosecutor:]        If we were to proceed without him, then there is probably [Rule] 3.850 issues I would imagine, but —

[Judge:]        No. You're talking about — forget [Rule] 3.850. You're on direct appeal. You already got the line — the minefield of the whole convicted felon thing that may or may not be able to be cleaned up. It's partially cleaned up with the Department of Corrections' reference in opening, but not completely until the evidence is in, because the opening's not evidence.

So, you got an issue there, and now we're [going to] throw in the main alibi witness is — since right before the trial, when we thought he was [going to] be present, is too sick to come, and that's not [going to] be a problem on a direct appeal, especially given the potential sentence he's facing?

[Prosecutor:]        It would be, Judge. I agree to that. I'm just not agreeing to stipulating to the deposition. I know the position —

[Judge:]        Okay. Well, then you're left with me having to reconsider their motion for mistrial. You want to try it again some other time? Is that what we're coming down to?

. . .

Well, let's make the record clear then. Your position is that you want — are you asking me to introduce McGuffin's depo? If the answer is no, then what's your position for the record?

| | |
|---|---|
| [Trial counsel:] | Oh, then at — yeah, we can't go forward without his deposition. |
| [Judge:] | Then you'd have to move for a mistrial, right? |
| [Trial counsel:] | Yes, we would have to move for a mistrial. |
| [Judge:] | Because of the unavailability of McGuffin? |
| [Trial counsel:] | Yes. |
| | . . . |
| [Judge:] | You want to — are you saying you want them to move for mistrial and not let the depo in? |
| [Prosecutor:] | Yeah. We're not agreeing to the depo coming in. We're absolutely objecting to that. We're — |
| [Judge:] | So, when they move for a mistrial, what's your answer? |
| [Prosecutor:] | They have grounds for it. |
| [Judge:] | You sure? Did you talk to Rip or Kendall or somebody that this is what you want to do? |
| [Prosecutor:] | They're entitled to move for it, Judge. Yes, I've talked to Rip. |
| [Judge:] | And he agrees with this? |
| [Prosecutor:] | There's some serious issues with respect to the fact this is their alibi witness, that is their defense, that we have the — need the ability to impeach and rebut what [the witness] had to testify to. There are several things that came out in opening that they never said in their — in their depo that, you know, we certainly — |

[Judge:]                 Well, she can't —

[Prosecutor:]            — would want to address.

. . .

[Judge:]                 All right. If they were playing it straight
                         and they object to the depo, it's not
                         necessarily admissible. I can't tell them
                         what strategy they should undertake or
                         what they can do. I've tried to suggest a
                         solution short of having to grant a mistrial,
                         but if they — legally, if I fudge it and do
                         that, I mean, I don't know that they —
                         I don't know what an appellate court is
                         [going to] say on a cross appeal if he gets
                         convicted. I suppose they would say,
                         you're right, the judge shouldn't have let
                         it in, but otherwise he would have had to
                         grant a mistrial, right?

                         You know, if that's what they want, then
                         if I just play it out step by step, even
                         though I don't think this is the best
                         solution, and I got to try another case
                         again, another two-day trial on top of the
                         thirty-two — or this is my thirty-second of
                         this year. So, instead of seventy, I'll
                         probably have seventy-one this year. And
                         somebody else who's sitting over there for
                         six-hundred days will be waiting for their
                         trial because I got to do this for two more
                         days. That's not your fault, but that's the
                         reality of where I am in this division. And
                         so, it's frustrating after delivering a day
                         and a half, and selecting a jury, to do this,
                         [ ] I have to say that.

                         Do I agree with that decision? Absolutely
                         not. I totally disagree with the decision.
                         What I — if I was standing there as the
                         prosecutor, let the depo in to get a
                         resolution in the case, especially as strong
                         as the DNA evidence appears to be, yes, I
                         would. I — the whole alibi thing wouldn't
                         concern me as much as what that is.

But the reality is, I can't — while I can make decisions, I don't think I can make their decision for them, just like I can't make your decision for you. Do I think it makes sense? No. Am I frustrated that I got to do this for [a] day and a half again? Yeah. But if I say yes, you're right. Legally, I can't admit the depo unless it's stipulated by the parties, which is what the State is urging upon me. I suppose that's the legal decision that I should make. You're right.

I can't admit the depo unless the State would stipulate to it. You're not, and you're objecting to the deposition, is that right, Mr. Baird?

[Prosecutor:]        That's correct, Judge.

[Judge:]        All right. So, based on my not admitting the deposition, not happily and not what I want to do, but the decision that I think I'm legally obliged to make, where does that leave you, Ms. McCabe?

[Trial counsel:]        I have to move for a mistrial, your Honor.

                . . .

[Judge:]        All right. I'm [going to] grant the mistrial then. I'm obliged. I don't think I can do anything else based on the defense's request. McGuffin is an essential witness. He would have to be here. Again, it's not what I want to do, but that's where we're at. I think you're probably best informed to find out what his medical condition is and, depending on how serious it is, whether you're [going to] need a depo to perpetuate as far as that's concerned between now and when we reschedule the trial.

"The Double Jeopardy Clause of the Fifth Amendment protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense." *United States v. Dinitz*, 424 U.S. 600, 606 (1976). "The Double Jeopardy Clause, however, does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding." *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982). "Where the trial is terminated over the objection of the defendant, the classical test for lifting the double jeopardy bar to a second trial is the 'manifest necessity' standard . . . ." *Kennedy*, 456 U.S. at 672. "But in the case of a mistrial declared at the behest of the defendant, . . . the 'manifest necessity' standard has no place in the application of the Double Jeopardy Clause." *Kennedy*, 456 U.S. at 672.

"A defendant's motion for a mistrial constitutes 'a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.'" *Kennedy*, 456 U.S. at 676 (quoting *United States v. Scott*, 437 U.S. 82, 93 (1978)). "Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, '[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error.'" *Kennedy*, 456 U.S. at 676 (quoting *Dinitz*, 424 U.S. at 609). "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Kennedy*, 456 U.S. at 676.

Trial counsel moved for a mistrial on two grounds. The prosecutor unwittingly elicited the testimony by the detective that the CODIS database used to match Elbert's DNA was a repository of the DNA of "convicted felons." Additionally, a key defense witness was

17

in the hospital and was unavailable for at trial, and the prosecutor refused to agree to allow the deposition testimony of the witness to be admitted in her stead (Doc. 8-2 at 368, 418, 427) Thus, the manifest necessity standard does not apply to Elbert's double jeopardy claim. *Kennedy*, 456 U.S. at 672. The prosecutor did not "goad" Elbert into moving for a mistrial; therefore, the state appellate court did not unreasonably deny Elbert's double jeopardy claim. *Kennedy*, 456 U.S. at 676. *Hawkins v. Alabama*, 318 F.3d 1302, 1308 (11th Cir. 2003) ("The *Kennedy* rule applies only to plain, unconcealed prosecutorial misconduct. The misconduct must not be secret if its purpose is to goad the defendant into moving for a mistrial.").

Ground One is **DENIED**.

**Ground Two and Ground Three**

In Ground Two, Elbert asserts that the trial judge violated his Fifth Amendment right against double jeopardy by imposing two separate sentences for the burglary conviction. (Doc. 1 at 12) He alleges that the trial judge imposed one sentence of forty years in prison under Section 775.084, Florida Statutes, the statute governing a sentence for a violent career offender. (Doc. 1 at 12) He alleges that the trial judge imposed a second sentence consisting of a fine and court costs under Sections 775.082 and 775.083, the statutes governing a sentence under Florida's sentencing guidelines. (Doc. 1 at 12) He asserts that Florida law prohibits a trial judge from imposing a sentence under both Section 775.083 and Section 775.084. (Doc. 1 at 12) He contends that he satisfied the terms of the second sentence by paying the fine and court costs and asserts that he unlawfully remains imprisoned under the first sentence. (Doc. 1 at 12)

In Ground Three, Elbert asserts that the post-conviction court denied his Fifth Amendment right against double jeopardy by requiring him to serve the prison term of the first sentence, even though he satisfied the terms of the second sentence by paying the fine and court costs. (Doc. 1 at 14)

The post-conviction court granted in part and denied in part Elbert's claim that his sentence, consisting of both a term of imprisonment and a fine, violated Florida law (Doc. 8-3 at 3) (state court record citations omitted):

> [T]he Defendant alleges that the imposition of a fine in addition to a [violent career criminal] sentence imposed under Section 775.084(4)(d), Florida Statutes, is illegal. The record reflects that the court imposed a $132.00 fine with a five percent surcharge. The State concedes that the imposition of the $132.00 fine with a five percent surcharge amounts to an illegal sentence. *See Willits v. State*, 884 So. 2d 73, 74 (Fla. 2d DCA 2004); *Floyd v. State*, 739 So. 2d 1241, 1242 (Fla. 2d DCA 1999); *Orona v. State*, 968 So. 2d 1060, 1061 (Fla. 2d DCA 2007) (citing *Webster v. State*, 705 So. 2d 970 (Fla. 2d DCA 1998)). Therefore, the Defendant's motion as to the fine and surcharge is granted, and the clerk is directed to strike the $132.00 fine with five percent surcharge from the Judgment and Sentence and the Judgment for Fines and Costs.
>
> The Defendant further alleges that because he has paid the fine and other costs, he is entitled to immediate release from his VCC sentence. However, in the instant matter, only the term of imprisonment is a permissible sentence for the Defendant's conviction. *See Orona v. State*, 968 So. 2d 1060, 1061 (Fla. 2d DCA 2007). The Defendant has not completed his term of imprisonment. Therefore, this claim is denied.

The post-conviction court amended the judgment and sentence by striking the fine. (Doc. 8-3 at 18)

Elbert filed a second motion to correct his sentence asserting that his sentence consisting of both a term of imprisonment and a fine and court costs violated his Fifth Amendment right against double jeopardy. (Doc. 8-3 at 187–88) The post-conviction court

denied Elbert's double jeopardy claim as follows (Doc. 8-3 at 208) (state court record citations omitted):

> In his previous 3.800(a) motion, the Defendant argued that the court had illegally sentenced him to a [violent career criminal] sentence and a guidelines sentence by imposing a fine. He further argued that, because he had paid his fine, he should be immediately released from his VCC sentence. In its April 19, 2017, order, the court agreed with the Defendant that the imposition of a discretionary fine in addition to a VCC sentence imposed under Section 775.084(4)(d), Florida Statutes (2010) is illegal. The court struck the fine from the Defendant's Judgment and Sentence and Judgment for Fines and Costs and found that only a term of imprisonment is a permissible sentence for the Defendant's conviction.
>
> In his present motion, the Defendant first alleges that the imposition of the $50.00 County Crime Prevention Fund "fine" is illegal because it was imposed under Section 775.083, Florida Statutes (2010), and is not authorized under Section 775.084(4)(d), Florida Statutes. The Defendant's assertion is incorrect because the fifty-dollar County Crime Prevention Fund is a mandatory court cost. *See* § 775.083(2), Fla. Stat. (2010) (" . . . court costs **shall be** assessed and collected in each instance a defendant pleads *nolo contendere* to, or is convicted of, or adjudicated delinquent for, a felony . . . . The court costs imposed by this section shall be fifty dollars for a felony . . . .") (emphasis added).
>
> The Defendant next claims that his original sentence violated double jeopardy because the court imposed two separate sentences: the VCC sentence and the fine. This claim is successive. The Defendant previously raised a substantially similar claim, which was denied and affirmed on appeal. *See* [ ] *Elbert v. State*, 2017 WL 4940163 (Fla. 2d DCA 2017). A defendant cannot litigate claims which were previously decided against him. *See State v. McBride*, 848 So. 2d 287, 291 (Fla. 2003).
>
> Finally, the Defendant claims that the court impermissibly increased his sentence in violation of double jeopardy when it amended his Judgment and Sentence and Judgment for Fines and Costs to remove the improper fine. He contends that, because he paid the fine, he need not serve the remainder of his VCC sentence. The court finds that this claim is without merit

> because the Defendant's sentence was not increased. The court
> further observes that this claim mimics his successive claim.
> Based on the foregoing, the Defendant's motion is denied.

Even though the post-conviction court denied Elbert's double jeopardy claim as successive, the Respondent does not assert that the denial of the claim on a state procedural ground bars review of the claim on federal habeas. The Respondent contends that Elbert exhausted the double jeopardy claim. (Doc. 8 at 10–11) Consequently, the Respondent waives the procedural bar. *Smith v. Sec'y, Dep't Corrs.*, 572 F.3d 1327, 1340 (11th Cir. 2009) ("If [ ] the petitioner did raise the claim in the state courts but not at the time or in the manner required by state procedural rules, the resulting procedural bar defense may be waived by the State's failure to assert it.").

Also, in his first motion to correct his sentence, Elbert did not assert the double jeopardy claim. Elbert instead asserted that his sentence violated state law. (Doc. 8-2 at 1254–56) In his second motion to correct his sentence, Elbert asserted for the first time the double jeopardy claim. (Doc. 8-3 at 186–89) Because Elbert did not assert the double jeopardy claim in his first motion to correct his sentence, the post-conviction court misapplied the state procedural rule barring a successive claim. Consequently, this Court may disregard the procedural bar and review the merits of the double jeopardy claim. *Brown v. Sec'y, Dep't Corrs.*, 200 F. App'x 885, 887 (11th Cir. 2006)[1] (holding that "[procedural] grounds relied upon by the state court are inadequate [if] they are based on an incorrect application of state procedural default law"). *Perez v. State*, 20 So. 3d 440, 442 (Fla. 4th DCA

---

[1] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

2009) ("There is no prohibition to the filing of successive Rule 3.800(a) motions so long as the merits of the issue presented have not previously been addressed . . . .").

"'[The Double Jeopardy Clause] protects against multiple punishments for the same offense.'" *United States v. DiFrancesco*, 449 U.S. 117, 129 (1980) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). However, "[t]he Double Jeopardy Clause does not provide the defendant with the right to know at any specific moment in time what the exact limit of his punishment will turn out to be." *DiFrancesco*, 449 U.S. at 137. Consequently, "[r]esentencing violates the double jeopardy clause only when it disrupts the defendant's legitimate expectations of finality." *United States v. Young*, 953 F.2d 1288, 1291 n.3 (11th Cir. 1992) (citing *Pennsylvania v. Goldhammer*, 474 U.S. 28, 30 (1985)).

*Bozza v. United States*, 330 U.S. 160, 166–67 (1947) (citations omitted), explains that a judge does not violate the right against double jeopardy by correcting a sentence that exceeds the punishment permitted by law:

> This Court has rejected the 'doctrine that a prisoner, whose guilt is established by a regular verdict, is to escape punishment altogether because the court committed an error in passing the sentence.' The Constitution does not require that sentencing should be a game in which a wrong move by the judge means immunity for the prisoner. In this case the court 'only set aside what it had no authority to do, and substitute(d) directions required by the law to be done upon the conviction of the offender.' It did not twice put petitioner in jeopardy for the same offense.[2] The sentence as corrected, imposes a valid punishment for an offense instead of an invalid punishment for that offense.
>
> > [2] In *Ex parte Lange*, 18 Wall. 163, relied on by petitioner here, the defendant had been sentenced to fine and imprisonment for violation of a statute which authorized a sentence only of fine or imprisonment. Since he had paid his fine and therefore suffered punishment under a valid sentence, it was held that his sentence had been

> 'executed by full satisfaction of one of the alternative penalties of the law . . . .' Therefore, Lange's plea, that the trial court could not correct the sentence without causing him to suffer double punishment, was sustained. But here the petitioner had not suffered any lawful punishment until the court had announced the full mandatory sentence of imprisonment and fine.

*See also DiFrancesco*, 449 U.S. at 137 ("[T]he Double Jeopardy Clause does not require that a sentence be given a degree of finality that prevents its later increase.").

Elbert filed a motion to correct his sentence and asserted that the imposition of a fine violated state law. (Doc. 8-2 at 1254–56) Because Elbert challenged the judgment's unlawful imposition of a fine, Elbert did not have a reasonable expectation of finality in the judgment. *United States v. Watkins*, 147 F.3d 1294, 1297–98 (11th Cir. 1998) ("Watkins's double jeopardy challenge is foreclosed by *Mixon*, where we held that resentencing does not violate the double jeopardy clause. Additionally, because Watkins challenged the aggregate sentence, he can have no legitimate expectation of finality in any discrete portion of the sentence.").

Also, because the trial judge sentenced Elbert as a violent career criminal under Section 775.084(4)(d), Florida Statutes (2010), and because Section 775.084 does not authorize a fine, the post-conviction court struck the fine. (Doc. 8-3 at 3) *Orona v. State*, 968 So. 2d 1060, 1061 (Fla. 2d DCA 2007).[2] Because the post-conviction court reduced Elbert's sentence by striking the fine and because Elbert did not have a reasonable expectation of finality in the original unlawful sentence, the trial judge did not violate Elbert's right against

---

[2] Whether the fine was unlawful is an issue of state sentencing law, and a state court's determination of state law receives deference in federal court. *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988).

double jeopardy by correcting the sentence. *Bozza*, 330 U.S. at 166–67. *United States v. Jackson*, 923 F.2d 1494, 1499 (11th Cir. 1991).

Elbert asserts that his sentence of imprisonment violates his right against double jeopardy because he satisfied the terms of his sentence by paying the fine and court costs. (Doc. 1 at 12, 14) Because the post-conviction court struck the illegally imposed fine from the judgment, Elbert did not satisfy the terms of his sentence by paying the fine. *Bozza*, 330 U.S. at 166–67.

A jury found Elbert guilty of burglary, a second-degree felony, and the trial judge determined that Elbert qualified as a violent career criminal. (Doc. 8-2 at 853, 857) A trial judge "shall sentence [a] violent career criminal as follows: . . . [i]n the case of a felony of the second degree, for a term of years not exceeding forty, with a mandatory minimum term of thirty years' imprisonment." § 775.084(4)(d)(2), Fla. Stat. (2010). Also, "court costs shall be assessed and collected in each instance a defendant pleads *nolo contendere* to, or is convicted of, or adjudicated delinquent for, a felony . . . ." § 775.083(2), Fla. Stat. (2010). Because Florida law required both a term of imprisonment and payment of court costs, Elbert did not satisfy the terms of his sentence by only paying the court costs.

In *Ex Parte Lange*, 85 U.S. 163 (1873), cited by Elbert (Doc. 21 at 17), the trial judge imposed both a term of imprisonment and a fine, even though the statute governing the sentence authorized either a term of imprisonment or a fine, but not both. *DiFrancesco*, 449 U.S. at 138. The defendant paid the fine and served five days in prison. *DiFrancesco*, 449 U.S. at 138. *Ex Parte Lange* held that the trial judge violated the defendant's right against double jeopardy by amending the sentence and imposing a new term of imprisonment after the defendant paid the fine. *DiFrancesco*, 449 U.S. at 138–39 ("The fine having been paid

24

and the defendant having suffered one of the alternative punishments, 'the power of the court to punish further was gone.' [T]o impose a year's imprisonment (the maximum) after five days had been served was to punish twice for the same offense.") (citing *Ex Parte Lange*, 85 U.S. at 175–76). Because Florida law required Elbert to both serve a term of imprisonment and pay court costs, *Ex Parte Lange* does not support Elbert's claim for relief.

Ground Two and Ground Three are **DENIED**.

**Ground Four and Ground Five**

In Ground Four, Elbert asserts that the trial judge violated his federal right to due process by granting the prosecutor's motion to compel a buccal swab without affording him a hearing and an opportunity to respond. (Doc. 1 at 16–17) In Ground Five, Elbert asserts that the trial judge violated his federal right to counsel by failing to inform him of the dangers and disadvantages of self-representation when he requested permission to represent himself. (Doc. 1 at 19–20)

Elbert did not raise the federal due process and right to counsel claims on direct appeal. (Doc. 8-2 at 1097–1154) Elbert raised the claims in a post-conviction motion titled "Motion for Relief from Order." (Doc. 8-3 at 792–97) The post-conviction court denied the motion as follows (Doc. 8-3 at 817–18) (state court record citations omitted):

> Defendant's motion argues that his due process rights were violated in pretrial proceedings involving a buccal swab because the court did not hold a *Faretta* hearing and the State did not serve him with a copy of the motion. Defendant contends that the order granting a buccal swab and his conviction should be vacated.
>
> Defendant is not entitled to relief because he has not raised any claims cognizable under any rule of criminal procedure. Defendant's motion cites Florida Rule of Civil Procedure 1.540, which is a civil rule and is not the appropriate rule to attack a criminal conviction. *Aswell v. State*, 310 So. 3d 983, 984 (Fla. 2d

25

DCA 2020). The court cannot consider Defendant's motion under Rule 3.850 (like in *Aswell*) because his motion is untimely and is not cognizable under that rule. Motions under Rule 3.850 must be filed within two years of the judgment and sentence becoming final. Fla. R. Crim. P. 3.850(b). Defendant's judgment and sentence became final in October 2016, more than two years before he filed the instant motion. This motion is therefore untimely under Rule 3.850. Further, claims of trial court error are not properly raised [under] Rule 3.850, and should have been raised on direct appeal. *Spencer v. State*, 842 So. 2d 52, 68 (Fla. 2003); *Sampson v. State*, 845 So. 2d 271, 272 (Fla. 2d DCA 2003). Defendant's claims would therefore not be cognizable if they were timely.

The court has also considered whether Defendant's motion could be treated as one filed under Rule 3.800(a), which has no time limit. But claims attacking the defendant's conviction, rather than the sentence, cannot be raised under Rule 3.800(a). *Coughlin v. State*, 932 So. 2d 1224, 1225 (Fla. 2d DCA 2006); *Butler v. State*, 917 So. 2d 244, 245 (Fla. 2d DCA 2005). Defendant's motion is therefore likewise improper under that rule.

Finally, the court has addressed most if not all of Defendant's arguments on this issue. Defendant previously filed a timely Rule 3.850 motion where Defendant argued that counsel was ineffective for failing to challenge the order granting a buccal swab for a number of reasons, including ones similar to those argued in this motion. The court addressed Defendant's arguments in an order denying his Rule 3.850 motion, and found that they were not a basis to challenge the order granting the buccal swab. Defendant is not entitled to successive review of these issues. Fla. R. Crim. P. 3.850(h)(2). Accordingly, it is ordered and adjudged that Defendant's motion is hereby dismissed.

The Respondent argues that the claims are unexhausted. (Doc. 8 at 18–19, 23)[3]

"If a petitioner fails to 'properly' present his claim to the state court — by exhausting his

---

[3] Elbert appealed the post-conviction court's denial of relief (Doc. 8-3 at 836–37), and the appeal was pending when Elbert filed his federal petition. After the Respondent filed the response, the state appellate court affirmed the denial of relief. *Elbert v. State*, 338 So. 3d 870 (Fla. 2d DCA 2022).

claims and complying with the applicable state procedure — prior to bringing his federal habeas claim, then AEDPA typically bars [a federal court] from reviewing the claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). "A party does not fairly present a claim if he presents the claim in state court for the first time in a procedural context in which the merits will not ordinarily be considered." *Harris v. Sec'y, Fla. Dep't Corrs.*, 709 F. App'x 667, 668 (11th Cir. 2018)[4] (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)). Because Elbert failed to properly raise the federal due process and right to counsel claims on direct appeal, Elbert failed to exhaust his remedies in state court. *Harris*, 709 F. App'x at 668.

Also, the Respondent argues that the claims are procedurally barred. (Doc. 8 at 18–19, 23) Because the post-conviction court dismissed the claims as untimely and successive, the claims are procedurally barred from federal review unless Elbert can demonstrate that either cause and actual prejudice or a miscarriage of justice excuses the procedural bar. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37. *LeCroy v. Sec'y, Fla. Dep't Corrs.*, 421 F.3d 1237, 1260 n.25 (11th Cir. 2005) ("This Court has already concluded that the procedural requirements of Florida's Rule 3.850 constitute independent and adequate state grounds under the applicable law.") (citing *Whiddon v. Dugger*, 894 F.2d 1266, 1267–68 (11th Cir. 1990)).

Elbert asserts that appellate counsel deficiently performed by not raising the claims on direct appeal. (Docs. 1 at 17, 20 and 21 at 19, 21–22) "Ineffective assistance of counsel [ ] is cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Before a habeas petitioner can rely on an allegation of ineffective assistance of counsel to

---

[4] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

demonstrate cause to excuse a procedural default, he must show that he properly raised the argument in state court, because ineffective assistance is itself a constitutional claim." *Ledford v. Warden, Ga. Diag. Prison*, 975 F.3d 1145, 1161 (11th Cir. 2020) (citing *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000)). Because Elbert asserted in his petition alleging ineffective assistance of appellate counsel that appellate counsel deficiently performed by not raising the claims on direct appeal (Doc. 8-3 at 283–302), Elbert exhausted the ineffective assistance of appellate counsel claims. *O'Sullivan*, 526 U.S. at 845; *Picard*, 404 U.S. at 278.

The two-part standard in *Strickland* applies to an ineffective assistance of appellate counsel claim. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Elbert must demonstrate both deficient performance and prejudice. *Smith*, 528 U.S. at 285.

**Right to Counsel Claim**

*Tuomi v. Sec'y, Fla. Dep't Corrs.*, 980 F.3d 787, 798 (11th Cir. 2020), explains that, before allowing a defendant to represent himself, a trial judge must ensure that the defendant knowingly and intelligently waives his right to counsel:

> Under the Sixth Amendment, as applied to the States through the Fourteenth Amendment, a criminal defendant has "the right to counsel at all 'critical stages' of a criminal prosecution." *United States v. Grimes*, 142 F.3d 1342, 1348 (11th Cir. 1998). On the other hand, a criminal defendant also has a constitutional right to self-representation if he so chooses. *Faretta*, 422 U.S. at 834–35. A request to proceed *pro se* and a waiver of the right to assistance of counsel, however, must be "knowingly and intelligently" made. *Id.* at 835.
>
> *Faretta* provides that when a defendant requests to discharge counsel and to proceed *pro se*, a trial court should conduct an inquiry and make the defendant "aware of the dangers and disadvantages of self-representation, so that the record . . . establish[es] that '[the defendant] knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams v.*

*United States*, 317 U.S. 269, 279 (1942)). "The ideal method of assuring a voluntary waiver is for the trial judge to conduct a pretrial hearing at which the defendant would be informed of the charges, basic trial procedures, and the hazards of self-representation." *United States v. Stanley*, 739 F.3d 633, 645 (11th Cir. 2014) (quoting *Strozier v. Newsome*, 926 F.2d 1100, 1104 (11th Cir. 1991)). However, while a pretrial hearing is preferred, it is merely "a means to the end," and "[t]he failure to hold a *Faretta* hearing is not error as a matter of law. If the trial record shows that a defendant knowingly and voluntarily elected to represent himself, the *Faretta* standard will be satisfied." *Id.* (quotations omitted); *see also Hooks v. State*, 286 So. 3d 163, 168 (Fla. 2019) (examining scope of a *Faretta* inquiry under Florida law, as set forth in Fla. R. Crim. P. 3.111(d),[11] and explaining that there is no requirement the court look into any specific factors "for there are no magic words under *Faretta*," and "the omission of one or more warnings . . . does not necessarily require reversal as long as it is apparent that the defendant knowingly and voluntarily waived the right to counsel" (quotations omitted)).

[11] Florida Rule of Criminal Procedure 3.111(d) provides that:

A defendant shall not be considered to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry has been made into both the accused's comprehension of that offer and the accused's capacity to make a knowing and intelligent waiver. Before determining whether the waiver is knowing and intelligent, the court shall advise the defendant of the disadvantages and dangers of self-representation.

**Initial Appearance**

Elbert asserts that appellate counsel deficiently performed by not arguing on direct appeal that the trial judge violated his federal right to counsel at the initial appearance by failing to inform him of the dangers and disadvantages of self-representation. (Doc. 1 at 19–21) At the initial appearance hearing, after the judge informed Elbert of the nature of the charges and denied bond, Elbert disputed the accuracy of some of the charges and asked the

judge for permission to represent himself. (Doc. 8-2 at 29–30) The judge responded (Doc. 8-2 at 30):

> [Judge:]  So, you can represent yourself. You'll be brought before a judge assigned to the case — cases. I'm not going to appoint the Public Defender since you want to represent yourself. That's not a problem.

The judge determined that probable cause supported the arrest. (Doc. 8-2 at 21) The judge further certified that Elbert was advised of the charges against him, his right to remain silent, his right to counsel, and his right to communicate with counsel, family, and friends. (Doc. 8-2 at 21) The judge did not discuss with Elbert the dangers and disadvantages of self-representation.

Under Rule 3.130(a), Florida Rules of Criminal Procedure (2010), a person who is arrested for a crime must appear before a judge within twenty-four hours of arrest. The judge must inform the defendant of the charge and provide the defendant a copy of the complaint. Fla. R. Crim. P. 3.130(b) (2010). Also, the judge must inform the defendant of his right to remain silent, his right to counsel, and his right to communicate with counsel, family, and friends. Fla. R. Crim. P. 3.130(b)(1)–(3) (2010). The judge must determine whether the defendant intends to retain counsel, seeks appointment of counsel, or waives his right to counsel. Fla. R. Crim. P. 3.130(c) (2010). Also, the judge must initially determine whether the defendant is entitled to pretrial release. Fla. R. Crim. P. 3.130(d) (2010) (citing Fla. R. Crim. P. 3.131). If the judge at the initial appearance hearing denies bail, a defendant may move for reconsideration before the trial judge assigned to the case. Fla. R. Crim. P. 3.131(d) (2010).

The procedures required by Rule 3.130, Florida Rules of Criminal Procedure, at an initial appearance hearing are nearly identical to the procedures required by Rule 5(d), Federal Rules of Criminal Procedure. *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1473–74 (11th Cir. 1992), *abrogated on other grounds by Coleman v. Singletary*, 30 F.3d 1420 (11th Cir. 1994) (footnote omitted), held that an initial appearance hearing that complies with the federal rule is not a critical stage in the proceedings:

> The Sixth Amendment right to counsel serves "to assure aid at trial," *United States v. Gouveia*, 467 U.S. 180, 188 (1984), and therefore attaches at the commencement of adversary judicial criminal proceedings. *See McNeil v. Wisconsin*, 501 U.S. 171 (1991); *see generally*, *Kirby v. Illinois*, 406 U.S. 682, 688–89 (1972). An accused's right to counsel extends to those "critical" pretrial proceedings in which "the accused is confronted, just as at trial, by the procedural system, or by his expert adversary, or by both . . . in a situation where the results of the confrontation might well settle the accused's fate and reduce the trial itself to a mere formality." *Gouveia*, 467 U.S. at 189 (citations omitted). Greenberg's initial appearance before a magistrate judge pursuant to Rule 5 of the Federal Rules of Criminal Procedure is not such a "critical proceeding." *See United States v. Dohm*, 597 F.2d 535, 543 (5th Cir. 1979), *reversed on other grounds*, *United States v. Dohm*, 618 F.2d 1169 (5th Cir. 1980) (*en banc*); *see also United States v. Perez*, 776 F.2d 797, 800 (9th Cir. 1985) (an initial appearance at which indictment is read, name of defendant is asked, defendant apprised of *Miranda* rights, and counsel appointed not a "critical stage").
>
> The initial appearance is largely administrative. In Greenberg's case, the court read the charges, ascertained his name, recited his *Miranda* rights, appointed counsel and set bail. Although the court in the initial appearance must consider the weight of the evidence against the defendant as one of many factors in setting bail, the bail hearing is not a trial on the merits in which the guilt of the accused is adjudicated. *United States v. Dohm*, 618 F.2d 1169, 1174 (5th Cir. 1980) (*en banc*). The defendant in seeking bail is not required to reveal the facts of his case. *Id.* Greenberg's bail hearing was no exception.

*See also United States v. Portillo*, 969 F.3d 144, 160–61 (5th Cir. 2020) (holding that a judge did not violate the defendant's right to counsel by failing to ensure that an attorney represented the defendant at the initial appearance hearing because the hearing was not a critical stage in the proceeding).

*Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 212 (2008), held that "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." However, *Rothgery*, 554 U.S. at 212, clarified that "[o]nce attachment occurs, the accused at least is entitled to the presence of appointed counsel during any 'critical stage' of the post-attachment proceedings; what makes a stage critical is what shows the need for counsel's presence." *See Portillo*, 969 F.3d at 161 ("Though Portillo's Sixth Amendment rights had attached by the time of his initial appearance, he was not necessarily entitled to a lawyer during the proceeding. Whether Sixth Amendment rights have attached is a separate inquiry from whether 'counsel must be *present* at a post-attachment proceeding.'") (italics in original) (quoting *Rothgery*, 554 U.S. at 211).

Because the initial appearance hearing was not a critical stage in the proceeding, the judge presiding over the initial appearance did not violate Elbert's right to counsel by failing to inform him of the dangers and disadvantages of self-representation. *United States v. Hakim*, 30 F.4th 1310, 1322 (11th Cir. 2022) ("If the waiver was not made by the accused with the requisite knowledge, then he has been deprived of 'the right to counsel' at any 'critical stage[ ] of the criminal process' at which he lacks a lawyer, including at '[a] plea hearing' and at other pretrial proceedings.") (quoting *Iowa v. Tovar*, 541 U.S. 77, 87 (2004)).

Because the issue on appeal would not have succeeded, appellate counsel did not deficiently perform. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

**Hearing on Pretrial Motions**

Elbert asserts that appellate counsel deficiently performed by not arguing on direct appeal that the trial judge violated Elbert's right to counsel before arraignment at a second hearing. (Doc. 1 at 19–21) He contends that, at the second hearing, the judge should have informed him of the dangers and disadvantages of self-representation. (Doc. 1 at 19–21)

On August 13, 2010, about two weeks after the initial appearance hearing, the prosecutor filed a motion to compel a buccal swab. (Doc. 8-2 at 36–37) The prosecutor stated that DNA from a swab of blood found in the burglarized home matched Elbert's DNA in a CODIS database. (Doc. 8-2 at 36–37) The prosecutor moved for permission to collect a buccal swab from Elbert to further analyze Elbert's DNA. (Doc. 8-2 at 37) Also, Elbert filed a *pro se* demand for a speedy trial and a *pro se* motion to change his plea. (Doc. 8-2 at 2)

At a hearing on August 16, 2010, eleven days before arraignment, the trial judge confirmed that Elbert received a copy of the arrest affidavit, acknowledged Elbert's *pro se* filings, and asked the prosecutor to summarize the evidence that supported the arrest (Doc. 8-2 at 43–44):

> [Judge:]    And the judge that conducted the advisory hearing found probable cause. Then you put in a motion for a change of plea, and then kind of a different — then you filed a

demand for speedy trial. So, on the one hand you're saying I want to change my plea[;] on the other, you're saying I want a speedy trial.

But what happened is you filed one on July 30th, that's the demand for speedy trial, and then on August the 3rd, you filed your motion for change of plea. So, anyway, the next thing that I hear from the clerk is that a formal charging document has been filed. I don't have a copy of it.

. . .

All right. So, you haven't even been formally arraigned yet. At an arraignment, basically you're advised of the specific charge, and why you're in this division [is] because this is the enhanced penalty division.

So, before you consider changing a plea, I think that it would be prudent for you to understand what your exposure is. Okay? So, let's hear from the prosecutor what this case is about.

After the prosecutor summarized the evidence that supported the arrest (Doc. 8-2 at 44–45), the trial judge advised Elbert of the maximum penalty for burglary (Doc. 8-2 at 45–46):

[Judge:]    So, residential burglary usually carries fifteen years; however, if you're a habitual offender, it carries up to thirty. And how we decide whether you're a habitual offender is you have to have two prior convictions occurring on two separate dates, and the last conviction is within the last five years, or your sentence ends within the next — within the last five years.

As a prison releasee [ ] reoffender, that [ ]
is within three years of release from
prison, this incident occurs. If that were
the case, the penalty would be a
mandatory fifteen years, day-for-day. So,
right now, you're standing at the podium
even without counsel. So, pretty serious
penalties.

The prosecutor has filed a formal charge,
and I hate for you — your last motion to
me is to change your plea, but don't you
think it would be a good idea to hear
exactly what the State is seeking and what
you're agreeing to?

[Elbert:]          Correct.

[Judge:]           Okay.

[Elbert:]          That's the reason I filed the motion, to
                   find that out, sir.

[Judge:]           Okay. Demand for speedy, what that
                   means is if I set it for trial, there will be no
                   negotiations. . . . So, that means whenever
                   I set it, you'd have to be ready for trial.
                   And you don't even have a lawyer yet, so
                   I guess — we haven't even had an
                   arraignment on this case yet. There will be
                   an arraignment in the near future.

After the prosecutor advised the trial judge that he had moved to strike the demand

for a speedy trial because Elbert filed the demand before the information was filed, the trial

judge informed Elbert that he should wait until arraignment to enter a plea (Doc. 8-2 at

47–48):

[Judge:]           So, the State filed, in response to your
                   motion for the demand for speedy trial,
                   a motion to strike your demand because it
                   was filed before the actual formal
                   document was filed.

| | |
|---|---|
| [Elbert:] | Prematurely? |
| [Judge:] | Yeah. So maybe, with your approval, what we'll do is we'll wait for arraignment day when you actually — the prosecutor formally arraigns you, and you can enter whatever plea you want. |
| | But if you want a lawyer at any time, please indicate [that] because we can appoint a lawyer to represent you. These are pretty serious penalties, some of them mandatory under the laws of Florida. Okay? |
| [Elbert:] | I'd just ask if the State has an offer today. |
| [Judge:] | I don't think that they do. |

The prosecutor informed Elbert that he did not intend to extend an offer at the hearing and asked the trial judge to rule on the motion to compel a buccal swab. (Doc. 8-2 at 48) The trial judge explained to Elbert the motion to compel and asked him if he wanted appointment of a lawyer (Doc. 8-2 at 48–49):

| | |
|---|---|
| [Judge:] | The State's motion to compel a buccal swab? |
| [Prosecutor:] | Yeah. |
| [Judge:] | Do you know what that is? |
| [Elbert:] | No, sir. |
| [Judge:] | It's like a Q-tip inside the cheek of your mouth. |
| [Elbert:] | Yes, sir. |
| [Judge:] | They rub it, and that's how they get your DNA. And they're going to compare that DNA to those droplets of blood that were found. |

36

| [Prosecutor:] | And this motion recites the CODIS hit and the circumstances I talked about when you asked me — |
|---|---|
| [Judge:] | You did get a copy of that arrest affidavit — |
| [Elbert:] | Yes, sir. |
| [Judge:] | — from advisory hearings where they gave reference to the drops? |
| [Elbert:] | Yes, sir. |
| [Judge:] | Okay. All right. So, do you want me right now to appoint a public defender, or do you want to wait till arraignment to think it over or what? |
| [Elbert:] | No. I'll continue to represent myself *pro se*. |
| [Judge:] | Okay. |

The trial judge asked the clerk to set a date for arraignment and informed Elbert that he would need to renew his demand for a speedy trial by filing a written demand at arraignment. (Doc. 8-2 at 49–50) The prosecutor submitted the motion to compel and a proposed order (Doc. 8-2 at 50):

| [Prosecutor:] | Judge, I have [the] State's original motion and an order and a true copy on the buccal swab, if I could approach. |
|---|---|
| [Judge:] | All right. |
| [Elbert:] | I'll get a copy of those documents at the jail? |
| [Judge:] | Sure. |
| [Prosecutor:] | You should have the motion already and we'll get a copy of the order after the judge signs it. |

37

[Elbert:]                Okay.

The judge declined to rule on Elbert's *pro se* demand for a speedy trial because he filed the demand before the prosecutor filed an information and declined to rule on Elbert's *pro se* motion to change his plea because arraignment had not occurred. *See* Fla. R. Crim. P. 3.191(b) (2010) ("[E]very person charged with a crime by indictment or information shall have the right to demand a trial within sixty days, by filing with the court a separate pleading entitled 'Demand for Speedy Trial' . . . ."); Fla. R. Crim. P. 3.170(a) (2010) (authorizing a defendant to plead guilty before arraignment only when the arrest affidavit charges the commission of a misdemeanor). The judge advised Elbert to re-file a written demand for a speedy trial and to enter a plea at arraignment. (Doc. 8-2 at 45–48) Because the judge declined to rule on Elbert's *pro se* filings, the hearing on the *pro se* filings did not amount to a "trial-like" confrontation between the prosecutor and Elbert. Consequently, the hearing on the *pro se* filings was not a critical stage in the proceedings. *See Rothgery*, 554 U.S. at 212 n.16 ("The cases have defined critical stages as proceedings between an individual and agents of the State (whether 'formal or informal, in court or out,' that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary.'") (citations omitted).

At arraignment, which occurred eleven days after the hearing, the trial judge complied with *Faretta* by offering to appoint Elbert counsel, informing him of the allegations in the arrest affidavit, advising him of the statutory maximum penalties that he faced, thoroughly discussing the dangers and disadvantages of self-representation, and asking him about his education and mental health. (Doc. 8-2 at 61–69) *Faretta*, 422 U.S. at 835.

If the pretrial hearing on the *pro se* filings and the motion to compel the buccal swab were considered a critical stage, Elbert could seek to demonstrate that ineffective assistance of appellate counsel serves as cause to excuse the procedural default. Under Florida law, a violation of the right to counsel that occurs during a pretrial hearing is *per se* reversible error on direct appeal. *Sherrod v. State*, 49 Fla. L. Weekly D1999 (Fla. 4th DCA Oct. 2, 2024); *Dickerson v. State*, 228 So. 3d 658 (Fla. 5th DCA 2017). However, when reviewing the claim *de novo* under federal law, a violation of the right to counsel at a pretrial hearing must be evaluated for harmlessness. *Wade*, 388 U.S. at 242. *Moore v. Illinois*, 434 U.S. 220, 232 (1977); *Coleman v. Alabama*, 399 U.S. 1, 11 (1970). *See also Rushen v. Spain*, 464 U.S. 114, 128 n.7 (1983) (Stevens, J., concurring) ("The Court has permitted harmless error analysis regarding deprivations of the right to counsel at pretrial stages of criminal proceedings, and naturally permits such analysis when the violation of the Sixth Amendment consists of the admission of evidence, since it is ordinarily possible to ascertain whether consideration of inadmissible evidence is harmless error.") (citations omitted). If harmless, the error affords no relief.

"On federal habeas review, a federal constitutional error is harmless unless there is 'actual prejudice,' meaning that the error had a 'substantial and injurious effect or influence' on the jury's verdict." *Lucas v. Warden, Ga. Diag. Classification Prison*, 771 F.3d 785, 791 (11th Cir. 2014) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Because of the '[s]tates' interest in finality,' the states' 'sovereignty over criminal matters,' and the limitation of habeas relief to those 'grievously wronged,' the Supreme Court set out in *Brecht* a standard that is more favorable to and 'less onerous' on the state, and thus less favorable to the defendant, than the usual harmless beyond a reasonable doubt standard." *Lucas*, 771 F.3d

at 791 (quoting *Brecht*, 507 U.S. at 637). "'[C]ollateral review is different from direct review,' and, therefore, [ ] 'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.'" *Lucas*, 771 F.3d at 791 (quoting *Brecht*, 507 U.S. at 633–34).

Even if Elbert demonstrated that he was entitled to counsel at the hearing, Elbert fails to explain what relief counsel would have obtained for him. Elbert informed the trial judge that he filed the *pro se* motion to change his plea to learn the crime that the prosecutor intended to charge and the penalty that the prosecutor intended to seek. (Doc. 8-2 at 46) When Elbert asked if the prosecutor was prepared to extend an offer, the prosecutor responded that he was not the prosecutor assigned to the case and that he was prepared only to present the motion to compel and to argue against the demand for a speedy trial. (Doc. 8-2 at 48) The trial judge accurately informed Elbert that he could face an enhanced sentence with a mandatory minimum penalty of thirty years in prison and a maximum penalty of forty years in prison. (Doc. 8-2 at 51) § 775.084(4)(d)(2), Fla. Stat. (2010). The trial judge accurately advised Elbert that, if he demanded a speedy trial, the trial judge would set the case for trial 0and the prosecutor would refuse to engage in any negotiations. (Doc. 8-2 at 46–47) Fla. R. Crim. P. 3.191(g).

Also, allegations in the motion to compel, which were supported by sworn facts in the arrest affidavit, demonstrated probable cause for the buccal swab. (Docs. 8-2 at 20, 36–37)[5] After the trial judge informed Elbert of the dangers and disadvantages of

---

[5] *Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

self-representation (Doc. 8-2 at 61–69), Elbert filed a *pro se* motion to suppress the buccal swab. (Doc. 8-2 at 140–43) The trial judge refused to grant Elbert an evidentiary hearing on the motion to suppress and informed Elbert that he either should accept appointment of counsel to assist with the motion or object to the admission of the buccal swab at trial. (Doc. 8-2 at 154–59) Elbert proceeded to trial with an attorney. His trial counsel had an opportunity to object to the admission of the buccal swab before trial and during trial. (Doc. 8-2 at 485, 669) *Tarpley v. Estelle*, 703 F.2d 157, 162 (5th Cir. 1983) ("Even if Tarpley could show that he was entitled to counsel prior to his indictment, he has shown no prejudice arising from his failure to receive appointed counsel at that time.").

Even if the judge granted the prosecutor permission to obtain a buccal swab from Elbert and the prosecutor used the buccal swab to match Elbert's DNA with DNA from blood at the burglarized home, other evidence at trial proved Elbert's guilt. A DNA expert testified that she extracted DNA from the swabs of the blood at the burglarized home, compared the DNA with DNA profiles of known individuals in the CODIS database, and discovered that the DNA from the swabs of blood matched Elbert's DNA profile. (Doc. 8-2 at 650–55) Even without the additional DNA analysis based on the buccal swab, the DNA expert's testimony proved that Elbert's DNA matched DNA from blood at the burglarized home. Also, Elbert did not dispute at trial that his blood was at the burglarized home and instead testified that the girlfriend of a member of the Aryan Brotherhood drew blood from him and placed his blood in a vial for DNA testing. (Doc. 8-2 at 740, 743–44) The defense argued in closing that the person who burglarized the home framed Elbert by leaving two drops of Elbert's blood at the home. (Doc. 8-2 at 805, 810, 812–13, 815–16)

Because DNA testimony based on the CODIS database proved that Elbert's blood was at the burglarized home and because Elbert did not dispute that his blood was at the burglarized home, any admission of the DNA testimony based on the buccal swab did not substantially and injuriously affect the jury's verdict. Consequently, even if Elbert overcomes the procedural default by demonstrating ineffective assistance of appellate counsel, any error from a violation of the federal right to counsel was harmless. *Brecht*, 507 U.S. at 637.

**Due Process Claim**

Elbert asserts that appellate counsel deficiently performed by not arguing on direct appeal that the trial judge violated his federal right to procedural due process. (Doc. 1 at 16–17) Elbert contends that the trial judge granted the prosecutor's motion to compel a buccal swab without first notifying Elbert and giving him an opportunity to respond and without determining whether probable cause supported the motion. (Doc. 1 at 16)

"The Fourth Amendment, binding on the States by the Fourteenth Amendment, provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Maryland v. King*, 569 U.S. 435, 446 (2013). "[U]sing a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search." *King*, 569 U.S. at 446.

"For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (citation omitted). "It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" *Fuentes*, 407 U.S. at 80 (citation omitted). To demonstrate a procedural due process violation, a party

42

must prove "(1) a constitutionally protected interest in life, liberty or property; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of procedures accompanying the deprivation." *Bank of Jackson Cty. v. Cherry*, 980 F.2d 1362, 1366 (11th Cir. 1993) (citing *Lehr v. Robertson*, 463 U.S. 248, 256 (1983)).

At the hearing on the prosecutor's motion to compel, the trial judge explained to Elbert the contents of the motion and asked Elbert whether he wanted appointment of counsel. (Doc. 8-2 at 48–49) Elbert advised that he wanted to continue to represent himself. (Doc. 8-2 at 49) The prosecutor provided the trial judge a copy of the motion and a proposed order. (Doc. 8-2 at 50) Elbert asked whether he would receive a copy of the motion and the order. (Doc. 8-2 at 50) The prosecutor responded that Elbert "should have the motion already" and advised that he would receive "a copy of the order after the judge signs it." (Doc. 8-2 at 50) The hearing occurred on August 16, 2010 (Doc. 8-2 at 39), and the prosecutor certified that he mailed a copy of the motion to Elbert on August 13, 2010. (Doc. 8-2 at 37)

In the motion to compel, the prosecutor alleged that DNA from a swab of blood found in the burglarized home matched Elbert's DNA in a CODIS database (Doc. 8-2 at 36–37):

> That on March 29, 2010, St. Pete Beach Police Department, as part of a burglary investigation to the home of Brenda Hitt located at 2742 West Vina Del Mar Boulevard, St. Pete Beach, Pinellas County, Florida, recovered swabs of biological material from the hallway floor and bathroom floor of the residence. The swabs were subsequently sent to the Florida Department of Law Enforcement and analyzed by Mary Pacheco, Crime Laboratory Analyst of the Biology Section. On June 17, 2010, Analyst Pacheco determined that during a search of the CODIS (Combined DNA Index System) database, a match occurred between the DNA profile obtained from the swab of the hallway floor and Richard Elbert, Jr., also known

43

> as Robert Elbert, white male, date of birth May 1, 1964.
> A buccal swab sample from Richard Elbert, Jr., also known as
> Robert Elbert, is required before a subsequent report addressing
> comparison testing and statistics regarding the analysis can be
> issued by Analyst Pacheco or another qualified DNA analyst.

Sworn facts in the arrest affidavit supported the facts alleged in the motion to compel. (Doc.

8-2 at 20)

Even if the trial judge failed to provide Elbert sufficient notice and an opportunity to

be heard before granting the prosecutor's motion to compel, Elbert fails to demonstrate

either that the motion to compel contained erroneous allegations or that probable cause did

not support the prosecutor's request for the buccal swab. The match between DNA on a

swab of the blood found in the burglarized home with Elbert's DNA in the CODIS database

demonstrated probable cause for the buccal swab. *Illinois v. Gates*, 462 U.S. 213, 238 (1983)

("The task of the issuing magistrate is simply to make a practical, common-sense decision

whether, given all the circumstances set forth in the affidavit before him, including the

'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair

probability that contraband or evidence of a crime will be found in a particular place.").

*See also King*, 569 U.S. at 446 ("A buccal swab is a far more gentle process than a

venipuncture to draw blood. It involves but a light touch on the inside of the cheek; . . . [t]he

fact than an intrusion is negligible is of central relevance to determining reasonableness,

although it is still a search as the law defines that term.").

Because Elbert fails to demonstrate that the trial judge violated his Fourth

Amendment right against an unreasonable search by granting the prosecutor's motion to

compel, his procedural due process claim fails. *Arrington v. Helms*, 438 F.3d 1336, 1348 n.12

(11th Cir. 2006) ("[T]o the best of our knowledge, neither the Supreme Court nor our circuit

has ever held a plaintiff can succeed on the merits of his or her procedural due process claim without first showing a deprivation of a constitutionally-protected liberty or property interest.").

Also, "a procedural due process violation is not complete 'unless and until the State fails to provide due process.'" *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (quoting *Zinermon v. Burch*, 494 U.S. 113, 123 (1990)). "In other words, the state may cure a procedural deprivation by providing a later procedural remedy . . . ." *McKinney*, 20 F.3d at 1557. As explained above, Elbert filed a *pro se* motion to suppress the buccal swab. (Doc. 8-2 at 140–43) At the hearing on the motion, after learning that probable cause supported the motion to compel the buccal swab, the trial judge denied Elbert's request for an evidentiary hearing and directed Elbert to either accept appointment of counsel to assist with the motion or seek relief at trial. (Doc. 8-2 at 154–59) Before trial, Elbert retained an attorney who did not challenge the admission of the buccal swab. (Doc. 8-2 at 485, 669)

Even if the trial judge violated Elbert's Fourth Amendment right by granting the prosecutor's motion to compel, the trial judge afforded Elbert an opportunity to challenge the admission of the buccal swab, and Elbert failed to take advantage of that opportunity. Because the trial judge provided Elbert an adequate post-deprivation remedy, the procedural due process claim is meritless. *Case v. Eslinger*, 555 F.3d 1317, 1331 (11th Cir. 2009) ("Even if Case had stated a claim that the retention of the legally seized property violated the Fourteenth Amendment, that claim would fail because Florida provided Case an adequate post-deprivation remedy.").

Because a procedural due process claim is meritless, appellate counsel did not deficiently perform by not arguing on direct appeal that the trial judge violated Elbert's right

45

to procedural due process. Consequently, appellate counsel's deficient performance does not serve as cause to excuse the procedural default. *Pinkney*, 876 F.3d at 1297.

Ground Four and Ground Five are **DISMISSED** in part as procedurally barred and **DENIED** in part.

Accordingly, Elbert's petition (Doc. 1) for a writ of habeas corpus is **DISMISSED** in part and **DENIED** in part. The Clerk is **DIRECTED** to enter a judgment against Elbert and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Elbert neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on February 11, 2025.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE